UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| DAVID & SUSAN ROTHMAN, ) <br> DAVID ROTHMAN FOR THE ESTATE ) <br> OF JEFFREY ROTHMAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> -vs- ) <br> ) <br> MYRTLE BEACH POLICE DEPARTMENT, ) <br> MYRTLE BEACH (MUNICIPAL ) <br> CORPORATION WITHIN SOUTH ) <br> CAROLINA), ) <br> ) <br> Defendants. ) <br> _____ ) | Civil Action No.: 4:04-cv-00060-TLW-TER <br><br><br><br><br><br> REPORT AND RECOMMENDATION |

Plaintiffs brought this action, *pro se*, against the defendants Myrtle Beach Police Department ("MBPD") and the City of Myrtle Beach ("the city" or "Myrtle Beach") on several causes of action arising out of their son's death in Myrtle Beach, South Carolina. Previously, defendants filed a motion to dismiss pursuant to Fed. R. Civ. P 12(b)(1) along with supporting memorandum filed April 5, 2004. The undersigned issued a report and recommendation recommending that the motion to dismiss be granted. On February 15, 2005, the Honorable Terry L. Wooden, United States District Judge, entered an Order granting in part and denying in part defendants' motion to dismiss. On March 24, 2005, defendants filed a motion and supporting memorandum for clarification of Judge Wooten's Order of February 15, 2005. On October 13, 2005, Judge Wooten entered an Order clarifying the previous order. In his Order of October 13, 2005, Judge Wooten ordered that plaintiffs' only remaining causes of action against the defendants are for failure to train, inadequate training, and deliberate indifference of its police officers in violation of 42 U.S.C. §1983. However, these

causes of action do not include any allegation that plaintiffs had a federal right to a police investigation. Plaintiffs' cause of action arising out of any right to an "investigation" was dismissed pursuant to Rule 12(b)(6)." The court went on to state, "[T]o the extent that plaintiffs allege that the defendants' police officers were inadequately or improperly trained and/or that their deliberate indifference upon the discovery of Jeffrey Rothman's body led to his death, this claim was not dismissed. The plaintiffs concede their claim focuses on the action of police who 'came upon a body and did not check for a pulse or ever attempted CPR.'" (Document # 40).

On September 5, 2006, defendants filed a motion for summary judgment along with a supporting memorandum and exhibits. (Document #66). Because the plaintiffs are proceeding pro se, they were advised on or about September 6, 2006, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th. Cir. 1975), that a failure to respond to the defendants' motion for summary judgment with additional evidence or counter affidavits could result in dismissal of the complaint. The plaintiffs filed a response in opposition on October 5, 2006. Defendants filed a reply on October 19, 2006, and plaintiffs then filed another reply on November 3, 2006.[1]

## I. FACTS/BACKGROUND

David and Susan Rothman's son, Jeffrey (hereinafter "Jeffrey") S. Rothman, died on March 14, 2001, in Myrtle Beach, South Carolina, while on spring break with three friends. Jeffrey left his three friends at the hotel. The three friends were arrested on March 13, 2001, for underage drinking

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the district judge.

and/or possession of drugs and required to stay overnight. (Def. Exhibit #9, plaintiffs' Exhibit #5). Jeffrey was not with his three friends at the time and was not arrested. Jeffrey made phone calls from the Happy Holiday Motel to his friends at the jail between approximately 9:45 p.m. and 10:45 p.m. on March 13, 2001. (Def. Exhibit #9, plaintiff's Exhibit #5). One of the friends last spoke with Jeffrey Rothman about 11:00 p.m. on March 13, 2001. A couple on the beach found Jeffrey's body around 4:00 a.m. on March 14, 2001. Specifically, a North Carolina college couple had been sitting and talking on the beach near the fishing pier at 2nd Avenue North when they saw something in the surf which they believed had feet. They left the beach and walked back to their hotel room to get a third friend. Myrtle Beach Police Department patrol officer Bishop Gibson was on duty around 4:00 a.m. on March 14, 2001, in the North Ocean Boulevard. Officer Gibson had parked his patrol car at a beach access at the end of 6th Avenue North and had been patrolling the area on foot which is a time when many college students are on spring break and congregate along Ocean Boulevard all times of the night and early morning hours. As Officer Gibson was walking, he was approached by three young adults waiving and calling to him. They told Officer Gibson they had seen something on the beach near the pier, an animal, object, or something that appeared to have feet. Believing that the young people may have observed a dead body, Officer Gibson radioed MBPD dispatch that he was going onto the beach to check out a "possible drowning." (Defs.' Exhibit #4, Gibson's Depo.). Officer Gibson then followed the three young people to the 6th Avenue beach access where they descended the stairs and began walking north toward the 2nd Avenue North Pier. Gibson attests in his depositions that there were some lights at the beach access itself which provided a minimum amount of light, but once they began walking north away from the beach access, the area became increasingly dark requiring him to use his flashlight to maneuver the sandy area and to locate what

-3-

the couple had observed. Gibson attests they first walked over the dry sandy area and then walked to the hard, wet sand. Gibson attests that approximately ten minutes later, he was able to shine the flashlight on a nude, pale body with absolutely no movement. (Exhibit #4). Gibson attests that the male body was lying face up and rigid. Officer Gibson states he instructed the three young witnesses to stay back from the body and he leaned over the body and shined the light onto the sand-covered face. Gibson attests that he saw the eyes were open and milky white[2], fixed and not moving. (Exhibit 4). Further, Gibson testified at his deposition that Jeffrey's chest was not going up and down and he was not breathing. Additionally, Gibson noted that there were numerous cuts and wounds with no blood flowing from then. (Exhibit 34). Gibson testified at his deposition that he could not remember whether he checked for a pulse. Nevertheless, defendants assert that defendant Gibson immediately believed it was a dead body. About the same time, another Officer, William Jackson, came upon the scene after hearing on the radio that Gibson was going to attempt to locate something on the beach believed to be a dead body. (Exhibit #35). Officer Jackson testified at his deposition that he had to use his flashlight to find his way to Jeffrey's body because it was so dark which took about ten (10) minutes to walk from the patrol car to where Officer Gibson was located. (Defs.'Exhibit #5, page 18-25).  Jackson testified at his deposition that after observing the body, he believed there were no signs of life and believed Jeffrey was dead (Exhibit 35). Officer Jackson asserted in his deposition that based on his experience in the medical field in the military and as a fireman, as well as a police officer, and to the best of his knowledge, Jeffrey was deceased. Further, Jackson testified that he was

---

[2] Plaintiffs argue that Jeffrey's eyes could not have been milky white in color due to the time frame. Plaintiffs assert that Jeffrey could not have been dead long enough for the color of his eyes to become milky which they assert takes approximately 15 hours from the time of death. Since Jeffrey made phone calls to the MBPD the night before his body was found, fifteen hours had not expired.

prepared to perform resuscitation but believed those efforts would have been useless in this instance. (Exhibit #5, Jackson depo.). Once Officer Gibson and Officer Jackson arrived and found Jeffrey's body, MBPD dispatch called Horry County EMS. (Exhibit #5, Jackson depo.). However, Jackson stated at his deposition that it took each officer several minutes, as long as ten minutes each to locate the body, once they left the street to go onto the dark beach. The couple that first discovered the body were unsure how long it took them to go from the beach near 4th Avenue North across the sand, the beach access, and then cross Ocean Boulevard to go to their motel room at 507 North Ocean Boulevard, go inside to get their friend, and then cross Ocean Boulevard again to meet up with Officer Gibson near the beach Access at 6th Avenue on the ocean side.

Officer Jackson testified at his deposition that the area where Jeffrey's body was found was treated as a crime scene and no passerby was allowed near the body or to disturb the body. Jackson testified that a crime scene log was made and each and every person coming near the body once it was found, including police officers, emergency medical technicians, and the coroner was required to sign in and out, noting the time. (Exhibit #5).

According to the declaration of Corporal Carol Allen, a crime scene specialist with the MBPD, she arrived on the beach where Jeffrey's body was located around 5:13 a.m. on March 14, 2001, before the sun rose. Corporal Allen, a thirteen-year veteran has been employed with the MBPD since April 21, 1993. (Exhibit #1). In her declaration, Allen stated once she arrived, she immediately began taking numerous photographs of Jeffrey and the surrounding area. Allen stated that when she arrived on the scene, it was obvious the ocean waters had washed Jeffrey's nude body ashore and then the waters had retreated. Allen asserted that his head was pointed toward the south, feet pointed north, a shell was between his legs, there were no signs of oozing of blood although there were

numerous scrapes and lacerations to the chest, face and chin, sand had caked on the indented portion of his chest, and his eyes were open, fixed, and glazed with sand particles on the eye itself. (Exhibit #1). Allen stated that once she finished taking the photos of the body and the scene, the body was removed because the tide was beginning to come in and a blanket was placed over his body due to the sun beginning to rise. (Def. Exhibit #1). MBPD Detective McCorkle called to Corporal Allen that she had located some items on 2nd Avenue pier, approximately two blocks south of where Jeffrey's body was located. Detective McCorkle found several items including two black socks, a black Nautica jacket, a black ball cap, a pack of Marlboro cigarettes, a pair of blue jeans with a black belt, a pair of white New Balance tennis shoes, a pair of white socks, a black Nautica t-shirt, and a pair of blue boxer shorts. On the blue jeans was a black ultra express pager, and in the pockets, a set of keys, a blue motel room key marked "300", a pack of Newport cigarettes, a pink Bic lighter, a five-dollar bill, two $1.00 bills, a pack of matches, a pair of sunglasses, and a New Jersey drivers license which appeared to be that of the young man found on the beach. In her report, Corporal Allen stated that she found a partially smoked Marlboro cigarette under a bench in a crack in the pier floor, as well as a chair in the northeast corner of the pier, a chair in the southeast corner, and a chair on the north side of the pier beside the bench. Corporal Allen took photographs of all items before touching anything. (Def. Exhibit #1, Exhibit H, Declaration of Carol Allen).

Defendants submitted the declaration of Dr. Edward Proctor, a board certified physician in anatomical pathology, clinical pathology, and forensic pathology performed the autopsy. In his declaration, Dr. Proctor declares that he was informed the first MBP Officer to discover the body, Officer Gibson, reached the body no earlier than 4:32 on Mach 14, 2001. Dr. Proctor estimates that when Officer Gibson and Officer Jackson found Jeffrey's body, he had been dead between two and

four hours. (Exhibit #2). He began the procedure at 7:30 a.m. on March 14, 2001, with the assistance of Leroy Rush, a hospital employee, and Corporal Carol Allen attended the autopsy. According to the Anatomical pathology results by Dr. Proctor, copious amounts of bloody and frothy fluid were found in Jeffrey's lungs and trachea, his stomach was dilated with clear liquid, his first and second toes of his left foot were broken, and blood was retained for a toxicologist evaluation. (Exhibit 2, Declaration of Dr. Proctor). The National Medical Services, Inc. performed a toxicology screen of the blood drawn from Jeffrey Rothman at the time of the autopsy which revealed blood samples positive for Ecstasy. Dr. Proctor's autopsy report ruled the cause of death "Asphysia due to drowning and effects of MDMA (Ectasy)." (Def. Exhibit #2).

In his declaration, Dr. Proctor declares that, at the request of the City's counsel in this action, Dr. Proctor reviewed his file, including his autopsy report, as well as the photographs taken of Jeffrey Rothman's body on the beach by Corporal Carol Allen of the MBPD around 5:30 a.m., before sunrise, on March 14, 2001, within an hour of when the body was found. As a result, Dr. Proctor determined that based upon his medical education and professional experience, as well as his performance of Jeffrey S. Rothman's autopsy and recent review of the March 14, 2001, photos of the body, within a medical degree of certainty, Jeffrey S. Rothman was beyond resuscitation when he was found by the first MBPD officer to reach him. Further, in his professional and medical opinion, Dr. Proctor opined that Jeffrey Rothman could not have been revived even if CPR immediately had been administered properly to him when his body was discovered at 4:32 a.m. (Def. Exhibit #2, Declaration of Dr. Proctor). Dr. Proctor stated "I reiterate my original conclusion that Jeffrey S. Rothman died from asphyxiation due to drowning and the effects of MDMA, Ecstasy, as stated in my original autopsy report." (Proctor's declaration, Exhibit #3).

Defendants also submitted the deposition of Warren Gall, Chief of the Myrtle Beach Police Department, employed there for twenty-six years and Chief for nine years. Gall stated that before the fall of 2001, the South Carolina Criminal Justice Academy taught CPR course to all of its graduates and all MBPD sworn officers are required to attend and pass the Academy's six week course. Gall stated that the MBPD began teaching CPR at its annual in-service training course after the Academy quit teaching CPR in the fall of 2001. (Def. Exhibit #6 ).

Plaintiffs also submitted several exhibits including, but not limited to, the deposition of Gall, Leath, Gibson, and Jackson. Plaintiffs also submitted the declaration of Charles Deal, their private investigator. (Plaintiffs' Exhibit #3).  Mr. Deal sets out he was hired by the Rothman family to investigate the death of their son and he interviewed two of the people that discovered Jeffrey's body. Based on his declaration, both witnesses stated that they could not say for sure whether or not the officers felt for a pulse or touched the body. (Plaintiff's Exhibit B).

Plaintiffs also submitted a copy of pages in a document entitled "Cold Water Survival Manual." These pages discuss what to do in cold water and how your body reacts. It discusses the fact that mammals can appear to have the symptoms of death such as skin discoloration, no apparent pulse or heartbeat, no detectable breathing and fully dilated (open) eyes and this can happen in humans but is not as pronounced as in mammals. (Plaintiffs' Exhibit O).

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

A federal court must liberally construe pleadings filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972), and Haines v. Kerner, 404 U.S. 519 (1972).  In considering a motion for summary judgment, the court's function

is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Department of Social Services, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c). The movant has the burden of proving that a judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that there is a genuine issue for trial." The opposing party may not rest on the mere assertions contained in the pleadings. Fed. R. Civ. P. 56(e) and Celotex v. Catrett, 477 U.S. 317 (1986).

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. See Fed. R. Civ. P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the non-moving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In the Celotex case, the court held that defendants were "entitled to judgment as a matter of law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements of his case with respect to which he has the burden of proof. Celotex, 477 U.S. at 322-323.

### III. ANALYSIS

Defendants argue the City is entitled to summary judgment because no material factual

disputes remain to allow the Rothmans a trial on the issues. Defendants argue that the Rothmans claim their constitutional rights and those of their deceased son were violated because the City failed to properly train or inadequately trained its officers to perform CPR on persons appearing dead on the beach when they first come upon them, that their constitutional rights and those of their deceased son were violated because without proper training Officer Gibson and/or Officer Jackson failed to actually check for a pulse and/or perform CPR upon their son when they first came upon him, and that their constitutional rights and those of their deceased son were violated because the City had a policy or procedure of failing to train its officers in CPR.

Defendants argue that there is no constitutional right to first aid from police officers at the scene of an accident. Thus, defendants argue that "the City cannot be held liable under §1983 for an alleged failure to train or inadequate training of its officers to render first aid or CPR when they came upon Jeffrey Rothman's body on the beach on March 14, 2001, even if CPR may have revived him. Furthermore, there is absolutely no evidence that the City policy makers were deliberately indifferent to the Rothman's son's needs, or that the City had a policy or procedure of failing to meet their son's medical needs in this instance by having its officers inadequately trained in CPR." Consequently, defendants argue the City is entitled to summary judgment. In fact, the evidence is just the opposite argues the defendants. Defendants contend that police officers are trained in CPR, either in-house or by the South Carolina Criminal Justice Academy, and were so in March 2001. Defendants cite to the case of <u>Deshaney v. Winnebago County Dept. of Social Servs</u>., 489 U.S. 189, 109 S.Ct. 998, 103 L.ed2d 249 (1989), where the court held that the "Due Process Clause generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." (Defendants'

memorandum p. 14). Defendants also cite to the case of <u>Tatum v. City and County of San Francisco</u>, 441 F.3d 1090 (9th Cir. 2006) which it summarily rejected. In that case, a man was arrested outside a police station when he refused to stop kicking the stations' door. The man was placed in handcuffs and placed on the ground. The two officers noticed his bloodshot eyes, heavy perspiration, and slurred speech and he would not stop kicking the door. Thus, the officer restrained him in handcuffs and placed him on the ground. While two officers noticed his breathing becoming shallow, they called EMS but did not perform CPR. The man was pronounced dead when the paramedics arrived. The estate sued the Officer and his employer, the City and County of San Francisco for violating his rights and raising a Due Process claim arguing the Officer was required to perform CPR. The Court held all that was required of the Officer was that he summon medical assistance and he was not required to perform CPR personally. (Def. Memorandum p. 14-15).

In their response, plaintiffs argue that the motion for summary judgment should be denied because there are genuine factual issues necessitating a trial.  Specifically, plaintiffs argue that "the police didn't check for a pulse, didn't perform CPR and could not definitely say if Jeffrey Rothman was still alive, yet they compounded this by not calling EMS in a timely basis. They failed and this failure is inexcusable." Plaintiffs assert the MBPD was notified by three witnesses that there was a possible body lying on the beach on March 14, 2001, they were slow to react, did not properly assess the victim for signs of life, and did not make any immediate call to provide prompt medical attention. Plaintiffs assert that the Officers told their superior officers in reports that they waited anywhere from 3-5 minutes before calling EMS when the evidence shows that it was at least a twenty minute delay based on EMS records. Thus, plaintiffs argue this is a discrepancy that the court should decide.

The next discrepancy plaintiffs address is that the Officers claim Jeffrey Rothman's eyes were

cloudy looking at the time they found him is impossible because all medical protocol in similar cases suggest that this "cloudy eye" scenario does not happen until 15 hours after death. Thus, if Jeffrey Rothman spoke to someone at 10:45 on March 13, 2001, he could not possibly have been dead 15 hours when he was found.

The next discrepancy that plaintiffs assert which they argue should be determined by the court deals with the issue of CPR training. Plaintiffs argue that defendants' counsel's statement on page 12 of the memorandum states that "when the Academy quit teaching CPR in the fall of 2001 as part of its general curriculum, the MBPD began teaching it as an annual in-service training course. However, plaintiffs assert that is not true because the South Carolina Police Academy did not discontinue CPR/First Aid Training until April 2003. (Exhibit J, declaration from Deputy Director Neill of the South Carolina Criminal Justice Academy). Plaintiffs contend that Officer Jackson is certain he had CPR and first aid-training with the MBPD but was uncertain if he was taught by the South Carolina Criminal Justice Academy or the MBPD itself. Therefore, plaintiffs argue the reasons the officers cannot remember is because the MBPD had no training or standard on how to provide any medical attention to victims the police came in contact with prior to March 14, 2001. Plaintiffs assert that Jeffrey Rothman could have been alive and suffering from a condition called hypothermia/mammalian diving reflex with symptoms of death. Plaintiffs assert that anyone looking at pictures of Jeffrey could not truthfully verify whether or not he could have been a victim of this condition which gives symptoms of death including skin coloration, no detectable breathing, no apparent pulse or heartbeat, and pupils fully dilated (opened). Plaintiffs contend that based on the exhibit from the Untied States Search and Rescue Task Force, "In the diving reflex, blood is diverted away from the arms and legs to circulate between the heart, brain and lungs." (Plaintiffs' Exhibit

O). Plaintiffs submit that the person would have to be touched to verify if he was really dead and the officers never touched Jeffrey Rothman to determine if he could have been alive because they were not properly trained. Plaintiffs argue that the City had no policy or procedures in place. Plaintiffs assert that the City Council and the City Manager failed after a number of warnings and attempts to correct policies and procedures and thus, there was deliberate indifference.

Defendants filed a reply in which they admit that there are numerous disputed and unknown factual issues in this matter but no genuine issues as to any material facts in this case. Defendants assert that deliberate indifference occurs where a city fails to act in response to repeated complaints of constitutional violations by its police officers and the Rothmans have failed to present evidence of deliberate indifference by the City. Defendants assert plaintiffs attached excerpts from City Council meeting minutes from 1998 through 2000 which reveal council members were concerned about the drownings in Myrtle Beach and wished to warn visitors about the dangers or riptides, that more than half of the City's police officers secured second jobs to meet their personal budges, the police department continuously updated its policies and procedures manual as its Chief of Police deemed fit, that the majority of City Council understood that in a Council Manager form of government, it had no business signing off on the police department's policies and procedures manual, and the majority of the City Council understood that an expensive audit of the police department without direction was unnecessary. Defendants argue that nothing in the excerpts show that the city leaders were deliberately indifferent of the need for more or different training of its police officers. Furthermore, defendants assert for liability to attach in this circumstance, the identified deficiency in a city's training program must be closely related to the ultimate injury. Defendants contend that the Rothmans cannot demonstrate that the alleged injury would have been

avoided had the employee been trained under a program that was not deficient in the identified respect. Defendants argue "Even if the Rothmans could prove a "deficiency" in the City's training program, they cannot prove that Jeffrey Rothman would have survived if the city had a training program that they believe was sufficient."

Defendants also respond to the Rothmans' argument that Jeffrey may have been suffering from a condition which gave the symptoms of being dead due to being in the cold water. Defendants argue that Jeffrey Rothman was not rescued from a cold ocean but was discovered around 4:30 a.m. on the beach long enough to be imbedded in the sand.

The Rothmans filed a second reply arguing as follows:

Plaintiffs have already acquiesced to the sad fact that there is no constitutional right to have police perform CPR. That, however, is not the gravaman of this case. This case is about a failure in training and that failure resulted in violations of 42 U.S.C. Section 1983.

Defendants cannot mislead this Court and suggest that there are no "material facts" in this case. Not checking for a pulse, not checking for a body temperature, and then waiting 21 minutes before calling EMS are indeed material facts and are relevant to this case.

The City failed to train its police officers in how to respond to the medical needs of victims they are called to help. That "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378 (1981)...

Jeffrey Rothman cannot speak for himself. We will never know if he was alive or not at the time the police found him. However, that is not the point of this case and we cannot lose sight of this. There was a body lying on the beach and that body could have been anyone's child. The police didn't know what to do in this situation and that is because there was a complete failure in training by the City and its police department.

They should have checked the body temperature to see if Jeffrey may have been suffering from hypothermia, but they did not, because they were not properly trained. They should not have waited 21 minutes before calling EMS. The officers tell their

> Supervisor, Capt. Kennedy, that they called EMS within 3-5 minutes of arriving on the scene. However, EMS records show that the delay was actually 21 minutes. The police should have called right away, but they didn't because they had no training. The point is that the police didn't know what to do and that is the sad but true facts of this case. "The delay in providing medical care creates a substantial risk of serious harm." Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004).

(Document #76).

An "inadequate training" claim can form the basis for §1983 liability in "limited circumstances." Lytle v. Doyle, 197 F. Supp.2d 481 (E.D. Va. 2001) (citing Board of County Comm'rs v. Brown, 520 U.S. 397. 407, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997)). Inadequate police training maybe actionable under §1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197 (1989). Moreover, for liability to attach, "the identified deficiency in a city's training program must be closely related to the ultimate injury." Id. at 391, 109 S.Ct. 1197. Such a deficiency must be shown by a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Id. at 385, 109 S.Ct. 1197.  The Court in King v. Harper, 2005 WL 3359098 (D.S.C. 2005), held the following:

> A police department, through a claim against one of its employees in their official capacity, may be liable for the failure to train its employees only where such failure "reflects 'deliberate indifference' to the rights of its Citizens."Doe v. Broderick, 225 F.3d 440, 456 (4th Cir.2000)(quoting City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Deliberate indifference may be found "only if 'in the light of the duties assigned to specific officers or employees, the need for more or different training is . . . obvious, and the failure to train is likely to result in the violation of constitutional rights.'" Jordan by Jordan v. Jackson, 15 F.3d 333, 341 (4th Cir.1994)(quoting City of Canton, 489 U.S. at 390)." 'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Mere negligence in the failure to train will not suffice to impose § 1983 liability. A plaintiff must also show that the deficiency in training was the cause-in-fact of the deprivation

of rights alleged. Jordan by Jordan v. Jackson, 15 F.3d at 341.

Id.

In this case, plaintiffs fail to show that the MBPD or Myrtle Beach was deliberately indifferent to the Officers' training or that any deficiency in training caused the deprivation alleged.

To the extent that plaintiffs are asserting a claim for negligent supervision under § 1983, their claim fails because negligence is not actionable under § 1983. Negligence, in general, is not actionable under 42 U.S.C. § 1983. *See* Daniels v. Williams, 474 U.S. 327, 328-36 & n. 3 (1986); Davidson v. Cannon, 474 U.S. 344, 345-48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); Ruefly v. Landon, 825 F.2d 792, 793-94 (4th Cir.1987); and Pink v. Lester, 52 F.3d 73, 78 (4th Cir.1995) (applying Daniels v. Williams and Ruefly v. Landon: The district court properly held that *Daniel*s bars an action under 1983 for negligent conduct.").

Based on the evidence presented, plaintiffs have not shown that the allegation of failure to properly train the officers was closely related to the death of Jeffrey Rothman. Plaintiffs have failed to show a direct causal link between a municipal policy or custom and a constitutional deprivation. Based on the evidence, defendant Officers were trained in CPR at the time of Jeffrey Rothman's death. Plaintiffs submitted a declaration of William R. Neill, the Interim Director of South Carolina Criminal Justice Academy. Mr. Neill declared that the South Carolina Criminal Justice Academy provided CPR/First Aid Instruction to its Basic Law Enforcement students up until April 2003. (Plaintiffs' Exhibit J). Further, Dr. Proctor opined from the autopsy he performed that Jeffrey Rothman had been dead between two and four hours at the time his body was discovered and had water in his lungs. Further, Dr. Proctor concluded from reviewing his file, including his autopsy report, as well as the photographs taken of Jeffrey Rothman's body on the beach by Corporal Carol

Allen of the MBPD around 5:30 a.m., before sunrise, on March 14, 2001, within an hour of when the body was found. As a result, Dr. Proctor determined that based upon his medical education and professional experience, as well as his performance of Jeffrey S. Rothman's autopsy and recent review of the March 14, 2001, photos of the body, within a medical degree of certainty, Jeffrey S. Rothman was beyond resuscitation when he was found by the first MBPD officer to reach him. Further, in his professional and medical opinion, Dr. Proctor opined that Jeffrey Rothman could not have been revived even if CPR immediately had been administered properly to him when his body was discovered at 4:32 a.m. (Def. Exhibit #2, Declaration of Dr. Proctor).

Plaintiffs have not put forth any expert testimony that Jeffrey Rothman could have still been alive at the time the officers got to his body and/or that CPR would have revived him. The record only contains speculation as to the possible presence of hypothermia/mammalian diving reflex at any relevant time. As plaintiffs have admitted, there is no constitutional right for Officers to perform CPR on an individual. As to the failure to train allegation by plaintiffs, it fails in that plaintiffs have failed to show a direct link between a policy and between the officers failing to perform CPR, failing to call EMS for twenty minutes as plaintiffs assert, and/ or not checking for a pulse or the body temperature and Jeffrey Rothman's death. Further, plaintiffs have failed to show deliberate indifference on the part of the officers based on their observation of the body and situation at the time they observed the body. Plaintiffs have not shown that a deficiency in Myrtle Beach's training program for the MBPD is closely related to the ultimate injury. Based on the medical opinion of Dr. Proctor, it would not have revived him in that he had been dead for two to four hours at the time his body was discovered. While the court is sympathetic to the Rothman's loss of their son, no constitutional violation has been shown. Therefore, it is recommended that defendants' motion for

summary judgment be GRANTED.

## IV.  CONCLUSION

Based on the above reasons, it is **RECOMMENDED** that the motion filed by the defendants for summary judgment (document #66) be **GRANTED IN ITS ENTIRETY** and that this matter be **DISMISSED**.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

November 15, 2006
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**